**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

QUICK CUISINE AG,

Case No.:  08-CV-1601
(Lynch, J.) (Francis, M.J.)

Plaintiff,

v.

UB2B INC., CMA TRADING INC., and
UNIVERSAL FOOD TRADING,

***CERTIFICATION OF***
***MICHAEL J. MAROTTE***

Defendants.

---

Michael J. Marotte, of full age and being sworn upon here oath certifies as follows:

1.    I am an Attorney at Law of the State of New York and a member of the law firm of Schenck, Price, Smith & King, LLP and am entrusted with the handling of this matter on behalf of Defendants, and, as such, I am fully familiar with the facts set forth herein.

2.    During the week of April 21, 2008, I personally contacted Plaintiff's counsel and requested Plaintiff's consent to vacate the default judgment entered against UB2B, Inc. and Universal Food Trading.

3.    Plaintiff's counsel denied this request.

4.    Attached hereto as Exhibit 1 is a true and accurate copy of the Complaint filed in this matter.

5.    Attached hereto as Exhibit 2 is a true and accurate copy of the Order to Show Cause filed in this matter.

6.    Attached hereto as Exhibit 3 is a true and accurate copy of the Affidavit for Judgment by Default filed in this matter.

7.    Attached hereto as Exhibit 4 is a true and accurate copy of the unsigned Letter of Intent.

{00977824.DOC.1 }

8.    Attached hereto as Exhibit 5 is a true and accurate copy of the expert report of Professor Joan Llorens Llacuna in this matter.

I certify that the foregoing statements made by me are true to the best of my knowledge. I am aware that if any of the statements made by me are willfully false, I am subject to punishment.

By: _____

Michael J. Marotte

Dated: August 21, 2008

*00977824*

# *Certification of Michael J. Marotte*

# *Exhibit 1*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

QUICK CUISINE AG,

                    Plaintiff,

    -against-

UB2B INC., CMA TRADING INC., and UNIVERSAL
FOOD TRADING,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

COMPLAINT

Civil Action No.

08 Civ 1601 (Ber)
Judge Lynch

Plaintiff, Quick Cuisine AG ("Quick Cuisine"), for its complaint against the defendants UB2B

Inc. ("UB2B"), CMA Trading Inc. ("CMA"), and Universal Food Trading ("Universal") (UB2B, CMA,

and Universal, collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an action by Quick Cuisine to recover (a) the reasonable and agreed value

of a variety of cooked foods in a unique, self-heating package ("Product") which Quick Cuisine sold and

delivered to the Defendants in June, 2007, at UB2B's specific request, for which Defendants have failed

and refused to pay despite Quick Cuisine's repeated demands for payment, (b) upon an account stated

by Quick Cuisine to Defendants to which said Defendants did not object, and, in fact, did advise Quick

Cuisine they would pay but, to date, have failed and refused to pay, and (c) the balance due to Quick

Cuisine from UB2B for banking charges owed by UB2B which were deducted by the bank from

amounts due from UB2B to Quick Cuisine for the reasonable and agreed value of Product which Quick

Cuisine sold and delivered to UB2B in May, 2007.

PARTIES

2.    At all times hereinafter mentioned Quick Cuisine was and is a corporation organized and existing under the laws of Switzerland, maintaining its principal place of business at Lettenstrasse 7, in the City of Rotkreuz, Switzerland.  Quick Cuisine maintains no offices for the transaction of business in the United States.

3.    At all times hereinafter mentioned Quick Cuisine was and is engaged in the business of manufacturing and selling a variety of cooked foods in a unique self-heating package ("Product").

4.    Upon information and belief at all times hereinafter mentioned defendant UB2B was and is a corporation organized and existing under the laws of the State of New Jersey, maintaining its principal place of business at 463 Barell Avenue, Carlstadt, New Jersey.

5.    Upon information and belief, at all times hereinafter mentioned UB2B was and is engaged in the business of distributing and selling merchandise of many types, including food, to various wholesalers and retailers.

6.    Upon information and belief at all times hereinafter mentioned CMA was and is a corporation organized and existing under the laws of the State of New Jersey, maintaining its principal place of business at 297-101 Kinderkamack Road, Oradell, New Jersey.

7.    Upon information and belief at all times hereinafter mentioned CMA was and is engaged in the business of distributing and selling merchandise, including food, to various wholesalers and retailers.

8.     Upon information and belief, at all times hereinafter mentioned, Universal was a New Jersey partnership formed by UB2B and CMA and/or their respective principals or is a trade name used by UB2B and CMA and/or their respective principals, maintaining its principal place of business at 463 Barell Avenue, Carlstadt, New Jersey.

9.     Upon information and belief at all times mentioned Universal was and is engaged in the business of distributing and selling merchandise, including food, to various wholesalers and retailers.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 (a) (2) as this action is between a foreign corporation and citizens of the State of New Jersey and involves a controversy in excess of $75,000, and supplemental jurisdiction pursuant to 28 U.S.C. §1367 (a).

11.     Venue is proper in this district pursuant to 28 U.S.C. §1391 (a) (2) in that a substantial part of the events giving rise to Quick Cuisine's claims occurred in the City, County, and State of New York.

## FACTS

12.     Quick Cuisine is the manufacturer of the Product which, in 2007, was not being manufactured in the United States. Pages from Quick Cuisine's website describing its Product are attached hereto as Exhibit A.

13.     After a series of meetings between UB2B's President, Fatima Siner, and CMA's President, Gus Eben, and Quick Cuisine's Marketing and Sales Agent, Sevim S.A. by its President, Nicky Sevim, in the City, County, and State of New York in early 2007, UB2B placed two orders with

3

Quick Cuisine for the Product, advised Quick Cuisine that it planned on placing more orders of similar size, and requested that Quick Cuisine manufacture and warehouse sufficient Product to satisfy its future orders which, it represented, would continue on a monthly basis for similar amounts.

14.    The first order ("First Order") was placed by UB2B in April, 2007, for 26,880 units of Product at a price of $89,686.13 as set forth in Quick Cuisine Invoice No. 1868 ("First Invoice"), copy annexed hereto as Exhibit B and incorporated herein by reference. (The Euros set forth in all invoices have been converted to dollars using a Euro/dollar exchange rate of 1.465.) The First Order was paid except for the sum of $1,686.00 for charges due the bank in connection with UB2B's letter of credit. This amount was deducted by the bank from amounts due to Quick Cuisine from UB2B for delivered Product, and are the responsibility of UB2B as set forth on the First Invoice, but UB2B failed to remit this amount to Quick Cuisine despite due demand therefor.

15.    The second order ("Second Order") was placed by UB2B in May, 2007, for 26,880 units of Product, at a price of $89,686.13 as set forth in Quick Cuisine Invoice No. 1882 ("Second Invoice"), copy annexed hereto as Exhibit C and incorporated herein by reference. At UB2B's request, these goods were sold and delivered to Defendants, to whom the Second Invoice is addressed. However, Defendants have failed to pay the Second Invoice despite due demands that they do so and repeated assurances by the Presidents of both UB2B and CMA that payment in full would be made.

## FIRST CLAIM AGAINST UB2B
### (Breach of Contracts)

16.    Quick Cuisine repeats and realleges the allegations of Paragraphs 1 through 15 hereof as if fully set forth herein.

17.    In or about April and May, 2007, Quick Cuisine and UB2B entered into two contracts. Pursuant to the First Order, Quick Cuisine agreed to sell and deliver specified Product to UB2B and, pursuant to the Second Order, Quick Cuisine agreed to sell and deliver specified Product to all Defendants, and UB2B agreed to pay specified sums to Quick Cuisine.

18.    UB2B breached the foregoing contracts between it and Quick Cuisine in that despite due demand therefor, UB2B has failed and refused to pay Quick Cuisine (a) with respect to the First Order, the sum of $1,686.00 which was deducted by the bank from amounts due to Quick Cuisine from UB2B for Product delivered to UB2B and which, pursuant to the parties' agreement as set forth on the First Invoice, were the responsibility of UB2B, and (b) with respect to the Second Order, the sum of $89,686.13 representing the agreed value of the Product which Quick Cuisine duly sold and delivered to Defendants at UB2B's specific request.

19.    As a result of the foregoing facts Quick Cuisine has been damaged in the amount of $91,372.13.

## SECOND CLAIM AGAINST ALL DEFENDANTS
### (Reasonable Value)

20.    Quick Cuisine repeats and realleges the allegations of Paragraphs 1 through 15, 17, and 18 hereof as if fully set forth herein.

21.    The reasonable value of the Product sold and delivered by Quick Cuisine to Defendants in June, 2007, was $89,686.13 which sum has not been paid to Quick Cuisine despite due demand therefor.

22.    As a result of the foregoing facts Quick Cuisine has been damaged in the amount of $89,686.13.

THIRD CLAIM AGAINST DEFENDANTS

(Account Stated)

23.    Quick Cuisine repeats and realleges the allegations of Paragraphs 1 through 15, 17, 18, and 21 hereof as if fully set forth herein.

24.    On June 27, 2007, Quick Cuisine forwarded the Second Invoice to each of the Defendants reflecting that the amount of $89,686.13 was due to it from Defendants, jointly and severally.

25.    Defendants never objected to the Second Invoice, and, in fact, the respective President of each of UB2B and CMA advised Quick Cuisine that the full amount would be paid.  To date, Defendants have failed to remit payment to Quick Cuisine on the account stated to them in the Second Invoice of $89,686.13

26.    As a result of the foregoing facts Quick Cuisine has been damaged in the amount of $89,686.13.

PRAYER FOR RELIEF

WHEREFORE, Quick Cuisine demands judgment as follows:

1.    On the First Claim against UB2B, in the amount of $91,372.13 together with interest as allowed by law from September 1, 2007; and

2.    On the Second and Third Claims against each of U2B2, CMA, and Universal, jointly and severally, in the amount of $89,686.13 together with interest from September 1, 2007; and

3.      The costs and disbursements of this action; and

4.      Such other and further relief as this Court shall deem just and proper.


Dated:  New York, New York
        February 13, 2008

                                    Respectfully submitted,
                                    TANNENBAUM DUBIN & ROBINSON, LLP

                                    By: _____
                                         Laura H. Rubin (LR 0332)

                                    1140 Avenue of the Americas
                                    New York, New York 10036
                                    Tel:    (212) 302-2900

                                    Attorneys for Plaintiff
                                    Quick Cuisine AG


SEM21081.L50

# EXHIBIT A



*User Instructions*     *Meals*     *Contact*



**QUICKCUISINE products are prepared meals which heat up all by themselves (self-heating).**

You now have the opportunity of tasting an excellent hot meal whenever and wherever you so desire.

**You will enjoy this very practical meal in a variety of places such as:**
Whilst travelling, camping, on the beach, at a picnic, whilst sailing, in the office or simply at home.



A delicious meal which heats up all by itself in the box

CAUTION: Open the can with caution. To avoid unecessary risks, do not open the kit and do not manipulate the heating system. Direct contact with the eyes can be harmful. Adhere to the user instructions. The meal can become extremely hot therefore ensure that the box is placed on a heat resistant surface.

STORE AT ROOM TEMPERATURE. DO NOT REFRIGERATE

Quick cuisine



Special FDA approved meals available for USA & Canada







# EXHIBIT B



**QUICK CUISINE AG**

Lettenstrasse 7
Postfach
CH-6343 Rotkreuz
Switzerland
Vat N°: 644 439

Tel : +41 41 792 02 37
Fax : +41 41 792 02 36

Représentant fiscal Schneider SA
7 rue Alexandre Freund BP 176
F 68 305 Saint Louis Cedex
Numéro de TVA: 33 492 972 922

*Marketing & Sales*

**SEVIM S.A.**
Espace 114, Grand-Rue 114
CH-1820 Montreux
Switzerland
Tel : +41 21 963 74 40
Fax : +41 21 963 74 39
Email: info@quickcuisine.info

EX WORKS FRANCE

INVOICE N° 1874

| Name | DYAD |
|---|---|
| Address | ZI des prés Loribes |
| | F-59 128 Flers en Escrebieux |
| | France |
| TVA N° | FR 00 439 626 888 |
| Contact | Jérémie |
| Tél | +33 3.27.86.96.30 |

| | |
|---|---|
| Date | 31 May 2007 |
| Order N° | 010307FS |
| Invoice N° | 1874 |
| REF. PROFORMA INVOICE | N° 1868 |
| Payment Terms | Balance due paid by irrevocable Letter of Credit payable at sight. All banking and other charges to be borne by customer. |

| | INVOICE TO: |
|---|---|
| Name | UB2B INC |
| Address | 463 BARELL AVE |
| | CARLSTADT, NJ 07072 |
| | U.S.A. |
| Tel: | 201 319 9700 |

| | |
|---|---|
| Client No.: | 21940 |
| Delivery: | Ex-works France |
| Destination: | U.S.A. |

| Quantity | Description | Weight | | Unit price | Amount (EUR) |
|---|---|---|---|---|---|
| | **Press 'nHEat self-heating meals** | 330 g | | | |
| 4032 | Tuna Burgundy with Vegetables | 10.58 oz | (FDA n° 030228009) | € 2.34 | € 9,434.88 |
| 6720 | Seafood Paella | 10.58 oz | (FDA n° 030228007) | € 2.29 | € 15,388.80 |
| 6720 | Ravioli stuffed with Vegetables in Tomato Sauce | 10.58 oz | (FDA n° 030228008) | € 2.24 | € 15,052.80 |
| 6720 | Rotini (Tortellini) with Tomato Sauce | 10.58 oz | (FDA n° 030523001) | € 2.24 | € 15,052.80 |
| 2688 | Salmon & Vegetables with Lemon Sauce | 10.58 oz | (FDA n° 030523003) | € 2.34 | € 6,289.92 |

Objections must be sent to us in writing within 7 days of receipt
of goods, failing which, they will not be considered.

No bank or other charges to be deducted from settlement.

Ownership of goods is retained until full settlement.

IMPORTANT: Payment to be made directly to:

| Bank: | CREDIT SUISSE, CH-8070 ZÜRICH |
|---|---|
| Account name: | QUICK CUISINE AG |
| IBAN (EUR): | CH55 0483 5084 2190 2200 0 |
| SWIFT / BIC: | CRESCHZZ80A |

Livraison exonérée selon l'article 262-I-1 du CGI

| | |
|---|---|
| Sub Total | € 61,219.20 |
| Total amount due immediately | € 61,219.20 |

# EXHIBIT C

**QUICK CUISINE AG**
Lettenstrasse 7
Postfach
CH-6343 Rotkreuz
Switzerland
**Vat N°: 644**430

**Tel :** +41 41 792 02 37
**Fax :** +41 41 792 02 36

Représentant fiscal Schneider SA
7 rue Alexandre Freund BP 176
F-68 306 Saint-Louis Cedex
Numéro de TVA: 33 492 972 922



**Marketing & Sales**
SEVIM S.A.
Espace 114, Grand-Rue 114
CH-1820 Montreux
Switzerland

**Tel :** +41 21 963 74 40
**Fax :** +41 21 963 74 39
**Email:** info@quickcuisine.info

**INVOICE N° 1882**

**EX WORKS FRANCE**

| Name | DYAD |
| Address | ZI des près Loribes |
| | F-59 128 Flers en Escrebieux |
| | France |
| TVA N° | FR 00 439 626 888 |
| Contact | Jérémie |
| Tél | +33 3.27.86.96.30 |

| Date | 27 June 2007 |
| Order N° | 120307GE |
| Invoice N° | 1882 |
| Payment Terms | 60 days from date of collection of goods from DYAD. Payment by wire transfer in EURO. |

**INVOICE TO:**

| Name | UB 3 INC / CMA TRADING INC / UNIVERSAL FOOD TRADING for PRESS 'nHEat |
| Address | 463 BARELL AVE |
| | CARLSTADT, NJ 07072 |
| | U.S.A. |
| Tel | 201 319 9700 |

| Client No.: | 21940 |
| Delivery: | Ex-works France |
| Destination: | U.S.A. |

| Quantity | Description | Weight | | Unit price | Amount (EUR) |
|---|---|---|---|---|---|
| | **Press 'nHEat self-heating meals** | 300 g | | | |
| 4032 | Tuna Burgundy with Vegetables | 10.58 oz | (FDA n° 030228009) | € 2.34 | € 9,434.88 |
| 6720 | Seafood Paella | 10.58 oz | (FDA n° 030228007) | € 2.29 | € 15,388.80 |
| 6720 | Ravioli stuffed with Vegetables in Tomato Sauce | 10.58 oz | (FDA n° 030228008) | € 2.24 | € 15,052.80 |
| 6720 | Rotini (Tortellini) with Tomato Sauce | 10.58 oz | (FDA n° 030523001) | € 2.24 | € 15,052.80 |
| 2683 | Salmon & Vegetables with Lemon Sauce | 10.58 oz | (FDA n° 030523003) | € 2.34 | € 6,289.92 |

Objections must be sent to us in writing within 7 days of receipt of goods, failing which, they will not be considered.

No bank or other charges to be deducted from settlement.

Ownership of goods is retained until full settlement.

IMPORTANT: Payment to be made directly to:

| Bank: | CREDIT SUISSE, CH-8070 ZÜRICH |
| Account name: | QUICK CUISINE AG |
| IBAN (EUR): | CH56 0483 5084 2190 2200 0 |
| SWIFT / BIC: | CRESCHZZ80A |

Livraison exonérée selon l'article 262-I-1 du CGI

| Sub-total | € 61,219.20 |
| Total amount due immediately | € 61,219.20 |

# *Certification of Michael J. Marotte*

# *Exhibit 2*

#5

LYN14.5,

At ///// of the United
States District Court for Southern District of
New York of held at the courthouse located
at 500 Pearl Street, New York, New York,
on the 28 day of April 2008.

```
+-------------------------------------------+
| USDC SDNY                                 |
| DOCUMENT                                   |
| ELECTRONICALLY FILED                       |
| DOC #: _____                     |
| DATE FILED: 5/1/08                         |
+-------------------------------------------+
```

PRESENT: Hon. Gerard H. Lynch
Judge

- - - - - - - - - - - - - - - - - - - - - - - - - - x

QUICK CUISINE AG,                    :

                      Plaintiff,     :

          -against-                  :

UB2B INC., CMA TRADING INC.          :
and UNIVERSAL FOOD TRADING,          :

                      Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER TO SHOW CAUSE

08 Civ. 1601 (GEL)

UPON the annexed affidavit of Laura H. Rubin, Esq. sworn to on April 25, 2008, and

the exhibits annexed thereto, it is hereby

ORDERED, that Defendants, UB2B Inc. ("UB2B") and Universal Food Trading

("Universal"), show cause at Court Room 6B of this Court, to be held at the courthouse thereof

located at 500 Pearl Street, New York, New York, on the 27 day of May, 2008, at 2:15

o'clock in the after noon of that day, or as soon thereafter as counsel can be heard, why an Order

should not be granted directing the Clerk of this Court to enter a default judgment in favor of

Plaintiff, Quick Cuisine AG, against Defendants UB2B and Universal jointly and severally in the

amount of $89,686.13, together with interest as allowed by law from September 1, 2007, and the

costs and disbursements of this action.

ORDERED, that sufficient reason appearing therefore, let service by nationally recognized overnight courier of a copy of this Order together with the papers upon which it was granted, upon each of Defendant U2B2 and Universal at their last known place of business, 463 Barell Avenue, Carlstadt, New Jersey 07072 on or before _April 30_____, 2008, be deemed good and sufficient service thereof.

ENTER

_____
U.S.D.J

4/28/08

*SEM42382.L99.docx*

# *Certification of Michael J. Marotte*

# *Exhibit 3*

#6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

QUICK CUISINE AG,

                                :       08 Civ. 1601 (GEL)

                 Plaintiff,   :

       -against-                            AFFIDAVIT FOR

                                  :     <u>JUDGMENT BY DEFAULT</u>

UB2B INC., CMA TRADING INC.,
  and UNIVERSAL FOOD TRADING,    :

               Defendants.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF NEW YORK  )

       LAURA H. RUBIN, being duly sworn, deposes and says:

         1.      I am a member of the Bar of this Court and am a member of the firm of

Tannenbaum Dubin & Robinson, LLP, attorneys for Quick Cuisine AG, the plaintiff in the

above-entitled action and I am familiar with all the facts and circumstances in this action.

         2.      I make this affidavit pursuant to Rule 55.1 and 55.2(a) of the Civil Rules

for the Southern District of New York, in support of plaintiff's application for the entry of a

default judgment against defendants UB2B Inc. ("UB2B") and Universal Food Trading

("Universal").  Plaintiff was unable to effect personal service upon defendant CMA Trading Inc.

         3.      This is an action to recover $89,686.13 owed jointly and severally by

defendants UB2B and Universal to plaintiff for goods sold and delivered by plaintiff to said

defendants at defendants' specific request, no part of which has been paid despite due demand

therefor.

         4.      Jurisdiction of the subject matter of this action is based on diversity

jurisdiction.

5.    This action was commenced on February 19, 2008, by the filing of the summons and complaint. A copy of the summons and complaint was served on the defendants on February 26, 2008, by personal service on authorized agents of each defendant and proof of service by the Special Process Server was filed with the Court on March 11, 2008. The defendants have not answered the complaint and the time for the defendants to answer the complaint has expired.

6.    This action seeks judgment for the liquidated amount of $89,868.13 against defendants UB2B and Universal jointly and severally, plus interest at 9% from September, 2007, for total interest as of April 30, 2008, of $5,372.73, as shown by the annexed Statement, together with costs and disbursements comprising the purchase of a civil action number ($325.00) and service of process on these two defendants ($300).

7.    An inquest is not necessary to determine damages because the amount sought is the liquidated amount set forth in plaintiff's invoice to defendants, a copy of which is annexed to the Complaint as Exhibit C. See Rule 55(a)1, Federal Rules of Civil Procedure.

8.    The disbursements sought to be taxed have been made in this action or will necessarily be made herein.

WHEREFORE, plaintiff requests the entry of Default and the entry of the annexed Judgment against defendants.

LAURA H. RUBIN

Sworn to before me this
25ᵗʰ day of APRIL , 2008

_____
Notary Public

ARTHUR STHACHWAY
NOTARY PUBLIC, State of New York
No. 01ST6118985
Qualified in Nassau County
Commission Expires Nov. 22, 2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

QUICK CUISINE AG,

                                 :      08 Civ. 1601 (GEL)

                Plaintiff,    :

       -against-                    STATEMENT OF DAMAGES

                                   :

UB2B INC., CMA TRADING INC.,
  and UNIVERSAL FOOD TRADING,    :

               Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

Principal amount sued for against Defendants UB2B Inc. and
Universal Food Trading Jointly and Severally ............................................................$89,686.13

Interest at 9% from September 1, 2007 through April 30, 2008 ($22.11 a day) ............. 5,372.73

Costs and Disbursements:

Clerk's fee ................................................................................................................ 350.00

Process Server fee for service ................................................................................. 300.00

Statutory Fee ...........................................................................................................

Total as of April 30, 2008 against UB2B and Universal jointly and severally
(includes costs and disbursements) ................................................................. 95,708.86

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

QUICK CUISINE AG,

                                    :       08 Civ. 1601 (GEL)

                    Plaintiff,   :

     -against-

                                      :      <u>CLERK'S CERTIFICATE</u>

UB2B INC., CMA TRADING INC.,
 and UNIVERSAL FOOD TRADING,     :

                   Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

      I, J. MICHAEL MCMAHON, Clerk of the United States District Court for the Southern District of New York, do hereby certify that this action commenced on February 19, 2008, with the filing of a summons and complaint, a copy of the summons and complaint was served on defendant UB2B Inc. by serving an authorized agent of said defendant on February 26, 2008, and on defendant Universal Food Trading by serving an authorized agent on February 26, 2008, and proof of such service thereof was filed on March 11, 2008.

      I further certify that the docket entries indicate that the said defendants have not filed an answer or otherwise moved with respect to the complaint herein. The defaults of the defendants are hereby noted.

Dated: New York, New York
      April 25 , 2008

                                         **J. MICHAEL MCMAHON**
                                         Clerk of the Court

                     By: _____
                                    Deputy Clerk

*SEM42483.doc*

# *Certification of*
# *Michael J. Marotte*

# *Exhibit 4*

December 22, 2006

Fatima Siner
c/o UB2B Plus Inc.
463 Barell Avenue
Carlstadt, NJ  07072

Dear Ms. Siner,

Pursuant to our recent discussions regarding your desire to protect Press 'n' Heat's interests while the terms and conditions of the Distributorship Agreement are being negotiated, attached please find a "discussion draft" of a proposed form of a Letter of Intent ("Letter") for your review and comment and, potential, revision.

Please note that there is included a "Schedule A" for the purpose of describing the products to be distributed.  Please provide to me a description of the Products, which I may include on the Schedule A.

Please review the Letter and communicate with me regarding same at your earliest convenience. As you are aware, after today I am out of the office through January 2nd.  Nevertheless, should it become urgent that you need to discuss this matter with me in my absence, you can reach me at 802-273-2616.

Should you have any questions regarding the foregoing, please do not hesitate to communicate with me.

Very truly yours,

Richard Jon Contant

RJC/ajg
cc:      Universal Trading Food, LLC
         Attn: Ulisses Sabato
         463 Barell Avenue
         Carlstadt, NJ  07072

         CMA Trading, Inc.
         Attn: Gus Eben
         297-101 Kinerkamack Rd.
         Oradell, NJ  07649

**Press 'n' Heat, L.L.C.**
463 Barell Avenue
Carlstadt, New Jersey  07072

December    , 2006

Quick Cuisine AG
Lettenstrasse
7 Postfach CH
6343 Rotkerenz
Switzerland

     <u>Attention</u>: Nicky Sevim

Dear Mr. Sevim:

In furtherance of the discussions between Fatima Siner and Stephen Server on behalf of Press 'n' Heat, L.L.C. ("Distributor") and you on behalf of Quick Cuisine AG ("Manufacturer") regarding an exclusive distributorship relationship, this letter ("Letter of Intent"), sets forth the parties' preliminary understanding of the principal terms upon which a formal agreement evidencing and memorializing such relationship ("Distributorship Agreement") will be executed.

1.    **Distribution Rights**. The Manufacturer ("you") and Distributor ("we") are negotiating the terms and conditions of a Distributorship Agreement under which Distributor will distribute the pre-packaged "to heat and serve" food products which you manufacture ("Products"), more particularly described in Schedule A.  The parties intend that the Distributorship Agreement will include and exclusive right of distribution in North America ("Territory"), with first right of refusal to Distributor for other territories, as the parties shall mutually agree ("the Transaction").

2.    **Distributorship Agreement**. The parties will diligently proceed with negotiation of the definitive Distributorship Agreement, the initial draft of which shall be prepared by us and submitted to you within fifteen (15) business days after your acceptance hereof ("Initial Draft Date") and the delivery of such acceptance to us ("Acceptance Date").  The final terms of the Distributorship Agreement are subject to good faith negotiations by both parties which are expected

1

to result in the Distributorship Agreement being executed no later than (30) days after the Initial Draft Date. The Distributorship Agreement shall contain, among other terms: (a) representations, warranties and covenants typical for transactions of this type, including, without limitation, a non-competition covenant by the parties; (b) reasonable indemnification relating to breaches of representations, warranties and covenants; (c) conditions precedent to each party's obligation to perform; (d) minimum Product purchase requirements; (e) Product payment terms; (f) compliance with FDA and other governmental regulations; (g) insurance; (h) default; (i) dispute resolution; (j) trademarks and trade names; (k) marketing efforts; (l) taxes and licensing; (m) financing; (n) Product pricing; (o) Product delivery and risk of loss; (p) Product inspection; (q) sales and marketing efforts; and (r) such other terms and conditions as are customary for the exclusive marketing and distribution of food products.

3.    **Term**.  The initial term of the Distributorship Agreement will be for a period of five (5) years, with the Distributor's option to renew for additional five (5) year periods on a "rolling" and "evergreen" basis, provided certain levels of Product sales, mutually acceptable to the parties, are met.

4.    **Due Diligence**.  During the Pre-Execution Period (as hereinafter defined), the Manufacturer shall provide to the Distributor such information regarding the Product, its patent status in the Territory and other information regarding the Manufacturer as Distributor may reasonably request, all of which information shall be deemed Confidential Information. We agree to provide to you such information about us and our proposed marketing and distribution plans as you shall reasonably request; all of which information shall be deemed Confidential Information.

5.    **Execution**.  The Execution of the Distributorship Agreement shall take place by the exchange of said document by both parties *seriatim* or executed in counterparts.  The period from the Acceptance Date hereof ("Effective Date") through Execution of the Distributorship Agreement is hereinafter defined as the "Pre-Execution Period".

6.    **Further Assurances and Supplemental Documentation**.  Each party shall give such further assurances and execute (or

2

cause to be executed) any such documents as the other may reasonably request in connection with the Transaction.

7. **No Shop or Solicitation**. For a period of sixty (60) days from the Effective Date ("Restricted Period"), the Manufacturer shall not, directly or indirectly, solicit, initiate, or encourage the submission of or accept proposals or offers from any person or entity to distribute the Products in the Territory, or otherwise enter into any similar business undertaking with respect thereto, and will take no action, nor suffer the taking of any action, which would impair, impede or otherwise prevent the consummation of the Distributorship Agreement.

7.1 Specifically, during the Restricted Period, the Manufacturer will not, and will not permit, suffer or allow any of its representatives, officers, directors, shareholders, equity holders, employees, or agents to, directly or indirectly, solicit, initiate, encourage, conduct or continue discussions or negotiations with any other person or entity concerning any distribution of the Products in the Territory (any such transaction being referred to herein as "Distribution"). The Manufacturer agrees to immediately advise the Distributor if the Manufacturer receives a Distribution proposal from another party, directly or indirectly, and will advise such party that it cannot and will not discuss such proposal.

8. **Expenses**. Each of the parties hereto agrees to bear its own expenses and any fees incurred in connection with the Distributorship Agreement contemplated hereby.

9. **Binding Letter of Intent**. The signatories hereto consider this a binding agreement to proceed with the negotiations of an exclusive Distributorship Agreement as outlined herein and each agrees to act in good faith in negotiating the terms of and finalizing the Distributorship Agreement and to use their best efforts to cause the satisfaction of any conditions precedent to the consummation thereof. Each signatory represents to the other that there are no agreements between any third parties which would prevent the entry into the Distributorship Agreement by such party or limit or impair the ability of such party to perform such Distributorship Agreement or obtain the benefits that would result therefrom.

9.1  Upon execution hereof, and in reliance on your
     undertaking to negotiate the Distributorship Agreement
     in good faith, we shall continue to develop its
     potential sales force for distribution of the Product
     in the Territory and continue to expend time, money
     and effort in the marketing effort required to effect
     the sale of the Product, on an expedited basis, in the
     Territory.  Also in reliance on your good faith, we
     shall engage counsel to draft the Distributorship
     Agreement, on an expedited basis, and undertake all
     required due diligence.

10.  **Arbitration**.  Any controversy or claim arising out of or
     relating to this Letter of Intent or the Distributorship
     Agreement shall be settled by arbitration in accordance
     with the rules of the American Arbitration Association, by
     one Arbitrator, in the City of Hackensack in the State of
     New Jersey, and shall be enforceable in any court having
     competent jurisdiction.

11.  **Confidentiality and Non-Disclosure**.  No party shall
     disclose the terms of the within Letter of Intent or
     Distributorship Agreement or any Confidential Information
     obtained in connection herewith, other than to their
     officers, directors, managers, employees, prospective
     agents, sales representatives, lenders, and their
     respective attorneys, accountants and advisors ("Authorized
     Persons").

     11.1 **CONFIDENTIAL INFORMATION.** "Confidential Information"
          means nonpublic information that a disclosing party
          ("Disclosing Party") designates as being confidential
          or which, under the circumstances surrounding
          disclosure the receiving party ("Receiving Party")
          should know is treated as confidential by the
          Disclosing Party.  Confidential Information includes,
          without limitation, non-public information relating to
          released or unreleased Disclosing Party Products, the
          marketing or promotion of any Disclosing Party
          Product, Disclosing Party's business policies or
          practices, financial information, technical
          information, computer systems, infrastructure designs,
          data, analysis, compilations, studies or other
          documentation and information received from others
          that Disclosing Party is obligated to treat as
          confidential.  Confidential Information disclosed to

4

Receiving Party by any Disclosing Party, its related entities and/or agents is covered by this Letter of Intent.  Confidential Information shall not include any information that: (i) is or subsequently becomes publicly available without Receiving Party's breach of any obligation owed to Disclosing Party; (ii) became known to Receiving Party prior to Disclosing Party's disclosure of such information to Receiving Party; (iii) became known to Receiving Party from a source other than Disclosing Party other than by the breach of an obligation of confidentiality owed to Disclosing Party; or (iv) is independently developed by Receiving Party without access to the Disclosing Party's information.

11.2 **OBLIGATION OF NON-DISCLOSURE.** Receiving Party shall not use or disclose any Confidential Information to third parties following the date of its disclosure by Disclosing Party, except as provided for by this Letter of Intent, the Distributorship Agreement or in accordance with judicial or other governmental order (provided Receiving Party shall give Disclosing Party reasonable notice prior to such disclosure and shall comply with any applicable protective order or equivalent).  Receiving Party shall safeguard the Confidential Information.  Receiving Party agrees to segregate all such Confidential Information from the confidential information of others in order to prevent commingling.  Receiving Party may disclose Confidential Information only to Receiving Party's Authorized Persons on a "need-to-know" basis.  The Receiving Party may use the Confidential Information only for the purpose of evaluating entering into the Distributorship Agreement that is currently being discussed by the parties hereto or after its execution in the performance of the Distributorship Agreement.

13.  **<u>Enforcement.</u>** In any arbitration proceeding or legal action brought to enforce the terms of this Letter of Intent or the Distributorship Agreement, the prevailing party shall be entitled to recover from the non-prevailing party or parties, its reasonable attorneys' fees and costs of such proceeding or action.

5

14.  **Acceptance**. If the Manufacturer agrees to the terms of the foregoing, please confirm acceptance thereof on a copy of this letter enclosed for that purpose ("Acceptance").

15.  **Signatory Authorization**.  Each individual who executes this Letter of Intent or its Acceptance, represents that he or she is duly authorized to do so, has the full power and authority to enter into the Transaction, individually and/or on behalf of any entity, and that there is no legal impediment or factual condition existent which would prevent the consummation of the Transaction by such party signatory as contemplated hereby.

16.  **Benefit**. This Letter of Intent shall bind and enure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns.  This Letter of Intent is not assignable by either party without the express written consent of the other party which consent may be withheld by such party in its absolute discretion.

**Press 'n' Heat, L.L.C.**

_____

By:  Fatima Siner,
     Authorized Signatory

**ACCEPTANCE**

The Manufacturer hereby accepts the terms of the foregoing Letter of Intent and agrees to perform the respective obligations to be performed by such Manufacturer thereunder.

**QUICK CUISINE AG**

By:  _____

     Nickey Sevim
     Authorized Signatory

6

<u>SCHEDULE A</u>
[TBC]

# *Certification of Michael J. Marotte*

# *Exhibit 5*

**Joan LLorens LLacuna Titular Professor in Chemical Engineering of the University Of Barcelona Spain.**

## OBJECTIVE

Determine the grade of hydratation of Calcium Oxide contain in the system of heating three cans of pre cooked food of the brand " QUICK CUISINE" Given to us from TSHS ( The Spanish Trading House ).

In The Beginning the heating of the food is based on the heat released by the Hydration of Oxide of Calcium obtain by the reaction of Oxide of Calcium in contact with water just in the moment need it to heat the food. If the Oxide of Calcium has been previously in contact with water hydrates in part or totally and looses the capacity of heating the food when mixed with more water.

## PROOFS

Two types of analysis had been done, to each one of the Oxides of Calcium of each one of the cans of this Food.

The first analysis consisted in register the weight the material looses when heated in an atmosphere of Nitrogen of 950 Degrees Celsius (1742 D. Fahrenheit) with a heating velocity of 10 Celsius per Min. (50 F). This analysis is known as TGA (Thermo Gravimetric Analysis). This analysis is used to determine the quantity of water of hydration of Oxide of Calcium coming off at a temperature of 440 to 470 Celsius. (824-878 Fahrenheit). The results of the analysis TGA had been

TGA (N2, 50.0 mL/Min)

30.0-950.0 Celsius,10 Celsius/Min.

The second analysis consisted in register the Heat absorbed for the material when heated in atmosphere of Nitrogen to a temperature of 600 Degrees Celsius ( 1112 Fahrenheit) with a heating velocity of 10 C/50 f per Min.

This Analysis is known as DSC ( Differential Scanning Calorimetric). With this analysis we can also determine the quantity of water in the hydration of Calcium Oxide because to get this water to come off ( at the temperature of 440c-to 470c) we have to supply to the test material 5660 j per Gram of Water detached. At the same time, once dehydrated the test Material analyzed has been heated again to proved that the dehydration has been completed.

The condition of the analysis DSC had been.

DSC (N2,50.0 Ml/Min)

30.0-600.0 Degrees Celsius 10/D Celsius / Min.

600.0-30.0 Degrees Celsius  10/D Celsius/Min.

30.0- 600.0 Degrees Celsius 10/D Celsius/Min.

Both analyses had been done to confirm and assure the truth of the results.

The 3 Cans analyzed were contained in the system of heating of 3 cans of all ready prepare food with reference indicated in the following table:

| TEST MATERIAL | FOOD | DUE DATE |
|---|---|---|
| 1 | Salmon and Potatoes w/ Lemon Sauce | 10/21/2007 |
| 2 | Chicken tikka Massala & Rice | 11/29/2008 |
| 3 | Chicken Tikka Massala & Rice | 11/29/2008 |

In The appendices A shows the labels of each one of the boxes as well as the UPC for each one.

## RESULTS

The detail of the results of both analysis TGA & DSC are shown in the appendices B & C respectively.

The resume of the results of the analysis TGA are Shown on the Following table.

| T Material | Weight grams | Temp Celsius | Weight Loose | % Dehydration |
|---|---|---|---|---|
| 1 | 0.01326 | 452 | 0.00199 | 62 % |
| 2 | 0.02878 | 460 | 0.00285 | 41% |
| 3 | 0.01383 | 465 | 0.00306 | 91% |
| | | | | |

In the Table is shown the initial weight of the material in grams. The medium  temperature that registers de detaching of water of the dehydration of Calcium Oxide. The weight loose of the material in grams and the degree of dehydration of the Calcium Oxide. The degree of the Hydration Of Calcium Oxide has been calculated taking into account that the reaction of Dehydration is the following

$$Ca\,(OH)_2 \longrightarrow CaO + H_2O$$

The resume of the results of the analysis DSC are Shown in the following table:

| T.Material | Weight Grams | Temp Celsius | Energy (J) | % Hydration |
|---|---|---|---|---|
| 1 | 0.00464 | 457 | 4.71 | 74% |
| 2 | 0.00718 | 456 | 3.90 | 40% |
| 3 | 0.00339 | 455 | 4.22 | 91% |
| | | | | |

This table shows the initial Weight in grams, the medium temperature that registers the heat of the dehydration of Calcium Oxide, the energy absorbed in the process of dehydration in Jules and the degree of hydration of the Calcium Oxide.

The degree of Hydration has been calculated taking into account that for every gram of water detached at 450 degrees Celsius 5660 Jules are needed.

The results obtained in both analysis are the same:
The Test Material # 1is Hydrated in a percentage between 60 & 75% , Test Material # 2 is Hydrated in a percentage of 40 % and Test Material # 3 is Hydrated in a percentage of 91 % .

## CONCLUTIONS

- The 3 Test Materials of Calcium Oxide are Partially hydrated .

- The Test Material # 1 is Hydrated in a percentage that goes from 60 to 75 % and because of this the activity to heat is comprehended between 25 & 40 % of the activity of the Calcium Oxide Dehydrated.

- The test Material # 2 is hydrated in a percentage of 40% and because of this its activity to heat is of 60 % of the activity of Calcium Oxide Dehydrated .

- The Test Material # 3 is Hydrated in a percentage of 91 % and because of this the activity to heat is around 9 % of the activity of Calcium Oxide dehydrated.

- The products examined do not meet the conditions for the correct process of auto heating mixing with water.
Its capacity of auto heating is enormously limited ( In Test Material # 3 is almost None...) And it seems really difficult that the manufacturer did not had Knowledge about this anomaly

that prevents this product to be sold with the necessary warranties .



UNIVERSITAT DE BARCELONA

Facultat de Química
Departament d'Enginyeria Química i Metal·lúrgia

Martí i Franquès, 1
08028 Barcelona
Tel. 93 402 12 88
Fax 93 402 12 91

NIF Q-0818001-J

Barcelona 19 de enero de 2008

**Apéndice A**. Recortes de las etiquetas de las tres cajas y códigos de barras de cada una de ellas















UNIVERSITAT DE BARCELONA

Facultat de Química
Departament d'Enginyeria Química i Metal·lúrgia

Martí i Franquès, 1
08028 Barcelona
Tel 93 402 12 84
Fax 93 402 12 91

NIF Q-0818001-J

Apéndice B. Detalle de los análisis TGA:





Facultat de Química
Departament d'Enginyeria Química i Metal·lúrgia

Martí i Franquès, 1
08028 Barcelona
Tel 93 402 12 88
Fax 93 402 12 91

NIF Q-0818001-J



Dictamen TSTB



UNIVERSITAT DE BARCELONA

Facultat de Química
Departament d'Enginyeria Química i Metal·lúrgia

Martí i Franqués, 1
08028 Barcelona
Tel 93 402 12 58
Fax 93 402 12 91

NIF Q-0818001-J

### Apéndice C. Detalle de los análisis DSC:





UNIVERSITAT DE BARCELONA

Facultat de Química
Departament d'Enginyeria Química i Metal·lúrgia

Martí i Franquès, 1
08028 Barcelona
Tel. 93 402 12 88
Fax 93 402 12 91

NIF Q-0818001-J



UNIVERSITAT DE BARCELONA

Facultat de Química
Departament d'Enginyeria Química i Metal·lúrgia

Martí i Franquès, 1
08028 Barcelona
Tel. 93 402 12 88
Fax 93 402 12 91

NIF Q-0818001-J

JOAN LLORENS LLACUNA, PROFESOR TITULAR DE INGENIERÍA QUÍMICA DE LA UNIVERSIDAD DE BARCELONA, A PETICIÓN DE IGNACIO MOLINA DE LA EMPRESA THE SPANISH TRADING HOUSE (TSTH)

## DICTAMEN

### Objetivo

Determinar el gado de hidratación del óxido de calcio contenido en el sistema para calentar tres latas de comida prepara, de la marca "QUICK CUISINE", suministradas por TSTH.

El principio para calentar la comida se basa en el calor liberado en la hidratación del óxido de calcio obtenido al poner en contacto el óxido de calcio con agua, justo en el momento que se quiere calentar la comida. Si el óxido de calcio ha estado previamente en contacto con agua se hidrata, en parte o totalmente, y pierde capacidad de calentar cuando se mezcla con más agua.

### Ensayos

Se han realizado dos tipos de análisis a cada uno de los óxidos de calcio de cada una de las latas de comida preparada.

El primer análisis ha consistido en registrar la pérdida de peso del material al calentarlo en atmósfera de nitrógeno hasta una temperatura de 950 °C, con una velocidad de calentamiento de 10 °C/min. Este análisis se conoce como análisis TGA (Termo Gravimetric Analysis). Con este análisis se puede determinar la cantidad de agua de hidratación del óxido de calcio al desprenderse a una temperatura de 440-470 °C.

Las condiciones del analisis TGA han sido:
TGA (N2, 50.0 mL/min).
30.0-950.0 °C, 10°C /min

El segundo análisis ha consistido en registrar el calor absorbido por el material al



UNIVERSITAT DE BARCELONA

Facultat de Química
Departament d'Enginyeria Química i Metal·lúrgia

Martí i Franquès, 1
08028 Barcelona
Tel 93 402 12 88
Fax 93 402 12 91

NIF Q-0818001-J

calentarlo en atmósfera de nitrógeno hasta una temperatura de 600 °C, con una velocidad de calentamiento de 10 °C/min. Este análisis de conoce como análisis DSC (differential scanning calorimetry). Con este análisis también se puede determinar la cantidad de agua de hidratación del óxido de calcio ya que para desprender esta agua (a la temperatura de deshidratación de 440-470 °C) hay que suministrar a la muestra 5660 J por cada gramo de agua desprendida. Al mismo tiempo, una vez deshidratada la muestra analizada se ha vuelto a calentar para comprovar que la deshidratación ha sido completa.
Las condiciones del análisis DSC han sido:
DSC (N2, 50.0 mL/min).
30.0-600.0 °C, 10°C /min
✳ 600.0-30.0 °C, -10°C /min
30.0-600.0 °C, 10°C /min

Los dos análisis se han realizado para confirmar y asegurar la veracidad de los resultados.

Las 3 muestras analizadas estaban contenidas en el sistema de calentamiento de 3 latas de comida preparada con las referencias indicadas en la tabla siguiente:

| Muestra | Tipo de comida | Fecha de caducidad |
|---------|----------------|--------------------|
| 1 | Salmon and Potatoes with Lemon Sauce | 21 10 2007 |
| 2 | Chicken Tikka Massala and Rice | 29.11.2008 |
| 3 | Chicken Tikka Massala and Rice | 29.11.2008 |

En el apéndice A se muestran los recortes de las etiquetas de las tres cajas así como los códigos de barras de cada una de ellas.

Dictamen TSTH

UNIVERSITAT DE BARCELONA

Facultat de Química
Departament d'Enginyeria Química i Metal·lúrgia

Martí i Franquès 1
08028 Barcelona
Tel 93 402 12 88
Fax 93 402 12 91

NIF Q-0818001-J

## Resultados

El detalle de los resultados de los análisis TGA y DSC se muestran los apéndices B y C, respectivamente.

El resumen de los resultados de los análisis TGA se muestran en la tabla siguiente:

| Muestra | TGA Peso ini. [g] | T ºC | Perd. Peso [g] | % Hidratación |
|---------|-------------------|------|----------------|---------------|
| 1 | 0.01326 | 452 | 0.00199 | 62½ |
| 2 | 0.02878 | 460 | 0.00285 | 41½ |
| 3 | 0.01383 | 465 | 0.00306 | 91½ |

En la tabla se muestra el peso inicial de muestra en gramos (Peso ini. [g]), la temperatura media en la que se registra la pérdida del agua de hidratación del óxido de calcio (T ºC), la pérdida de peso de la muestra en gramos (Perd. Peso [g]) y el grado de hidratación del óxido de calcio (% Hidratación). El grado de hidratación se ha calculado teniendo en cuenta que la reacción de deshidratación es la siguiente:

$$Ca(OH)_2 \rightarrow CaO + H_2O$$

El resumen de los resultados de los análisis DSC se muestran en la tabla siguiente:

| Muestra | DSC Peso ini. [g] | T ºC | Ener. [J] | % Hidratación |
|---------|-------------------|------|-----------|---------------|
| 1 | 0.00464 | 457 | 4.71 | 74½ |
| 2 | 0.00718 | 456 | 3.90 | 40½ |
| 3 | 0.00339 | 455 | 4.22 | 91½ |

En la tabla se muestra el peso inicial de muestra en gramos (Peso ini. [g]), la temperatura media en la que se registra el calor de deshidratación del óxido de calcio (T ºC), la energía absorbida en el proceso de deshidratación en Julios (Ener. [J]) y el grado de hidratación del óxido de calcio (% Hidratación). El grado



UNIVERSITAT DE BARCELONA

Facultat de Química
Departament d'Enginyeria Química i Metal.lúrgia

Martí i Franquès, 1
08028 Barcelona
Tel. 93 402 12 88
Fax 93 402 12 91

NIF Q-0818001-J

de hidratación se ha calculado teniendo en cuenta que por cada gramo de agua desprendida a 450 °C se precisan 5660 Julios.

Los resultados obtenidos por ambos análisis son concordantes: la muestra 1 está hidratada en un porcentaje que está entre el 60 y el 75%, la muestra 2 está hidratada en un porcentaje de alrededor del 40% y la muestra número 3 está hidratada en un porcentaje de alrededor del 91%.

## Conclusiones

- Las tres muestras de óxido cálcico analizadas están parcialmente hidratadas.

- La muestra 1 está hidratada en un porcentaje que va desde el 60 al 75% y, por tanto, su actividad para calentar está comprendida entre el 25 y el 40% de la actividad del óxido de calcio deshidratado.

- La muestra 2 está hidratada en un porcentaje del orden del 40% y, por tanto, su actividad para calentar es del orden del 60% de la actividad del óxido de calcio deshidratado.

- La muestra 3 está hidratada en un porcentaje del orden del 91% y, por tanto, su actividad para calentar es del orden del 9% de la actividad del óxido de calcio deshidratado.

- Los productos examinados no reúnen las condiciones para un proceso correcto de autocalentamiento al mezclarlos con agua. Su capacidad de autocalentamiento es muy limitada (en la muestra 3 es prácticamente nula) y parece difícil que el fabricante desconociera esta anomalía, que impide poner este producto a la venta con las debidas garantías.

Dr. Joan Llorens Llacuna

Dictamen TSTH

4



UNIVERSITAT DE BARCELONA

Facultat de Química
Departament d'Enginyeria Química i Metal·lúrgia

Martí i Franquès 1
08028 Barcelona
Tel 93 402 12 58
Fax 93 402 12 91

NIF Q-0818001-J

Barcelona 19 de enero de 2008

<u>Apéndice A</u>. Recortes de las etiquetas de las tres cajas y códigos de barras de cada una de
ellas









Dictamen TSTH

5



Facultat de Química
Departament d'Enginyeria Química i Metal.lúrgia

Martis Franqués, 1
08028 Barcelona
Tel 93 402 12 88
Fax 93 402 12 91

NIF Q-0818001-J

**Apéndice B**. Detalle de los análisis TGA:





Facultat de Química
Departament d'Enginyeria Química i Metal.lúrgia

Martí i Franqués, 1
08028 Barcelona
Tel 93 402 12 88
Fax 93 402 12 91

NIF Q-0818001-J





Facultat de Química
Departament d'Enginyeria Química i Metal·lúrgia

Martí i Franquès, 1
08028 Barcelona
Tel 93 402 12 88
Fax 93 402 12 91

NII Q-0818001-J

## Apéndice C. Detalle de los análisis DSC:



Dictamen TSTH



Facultat de Química
Departament d'Enginyeria Química i Metal·lúrgia

Martí i Franquès, 1
08028 Barcelona
Tel. 93 402 12 88
Fax 93 402 12 91

NIF Q-0818001-J

